# IN THE SUPREME COURT OF TEXAS

No. 14-0819

CADENA COMERCIAL USA CORP. D/B/A OXXO, PETITIONER,

v.

TEXAS ALCOHOLIC BEVERAGE COMMISSION, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

JUSTICE WILLETT, joined by CHIEF JUSTICE HECHT, dissenting.

When this shameful transaction is published to the world it will be seen what a vile system this brewing monopoly may become in the hands of unscrupulous persons. Thank God the tied house contains the seeds of destruction within itself, and the day will come—perhaps not in my time or in yours, but it will come to a certainty—when this shameful monopoly will be tolerated no more.[1]

That was the losing party's condemnation of England's pervasive tied-house regime in what is remembered as the "one man one drink" case. At the turn of the nineteenth century, an Englishman named Elliott Downs Till retired in the village of Eynsford, nestled within the farmland and woods of Kent, England. Till acquired considerable property in Eynsford and became invested in the value of his new surroundings. But one Eynsford establishment concerned Till: a small "public house" or beershop called "the Harrow," owned by a brewery, which Till would later

---

[1] "One Man One Drink—Landlord's Novel Methods—Objected to by Brewers," *Ashburton Guardian*, July 24, 1906, available at https://paperspast.natlib.govt.nz/imageserver-newspapers/AG19060724.pdf.

describe as "a place [that] encouraged drunkenness."[2] Till believed the establishment was better suited as "a proper place of accommodation" for travelers, so he contracted with the brewery to transform the Harrow into a country hotel called the Castle Inn.[3] After completing renovations, Till entered into a 50-year lease with the brewery, promising to keep the Castle Inn open "on the greatest number of days and hours that the law allowed," one of the "usual tied-house conditions."[4] He additionally pledged to "deal exclusively" with the brewery "for all porter, stout, beer, ale, or other malt liquors, whether draught or bottle, which should be sold or consumed" at the Castle Inn.[5] But Till abhorred promiscuous drinking and wanted the Castle Inn to focus less on plying liquor and more on welcoming hotel guests. So Till tried to limit consumption at the Inn, imposing a semi-teetotaling "one man, one drink" policy. The brewery successfully sued, contending the liquor limits breached the lease.

Till's story was one that would be replicated throughout England, and ultimately America. Tied houses, saloons owned by or under exclusive contracts with producers, saturated pre-Prohibition America. But once the Twenty-First Amendment ended what President Hoover called the "noble experiment," the federal government and the states enacted sweeping legislation aimed at eliminating tied houses.

---

[2] "One Man One Drink," *Timaru Herald*, Vol. LXXXIII, Issue 13006, June 20, 1906, available at https://paperspast.natlib.govt.nz/newspapers/THD19060620.2.40.

[3] The Castle Inn was renamed the Castle Hotel and remains open today. *See* http://www.castlehotelkent.com (copy in case file).

[4] "One Man One Drink—Landlord's Novel Methods—Objected to by Brewers," *Ashburton Guardian*, July 24, 1906, available at https://paperspast.natlib.govt.nz/imageserver-newspapers/AG19060724.pdf.

[5] *Dartford Brewery Co. Lim. v. Till and Godfrey* (1907) 95 L.T. 1, 643.

Texas enacted its own tied-house prohibitions in the 1930s and has amended them repeatedly since then. The key provision in today's case is section 102.07(a)(1) of the Alcoholic Beverage Code, which states "no person who owns or has an interest in the business of a . . . brewer . . . may . . . own or have a direct or indirect interest in the business of a . . . retailer."[6]

The Texas Alcoholic Beverage Commission denied Cadena Comercial's application for a retailer's permit because Cadena's publicly traded parent company, FEMSA—several levels of intermediate ownership removed from Cadena—owns a 20 percent stock interest in and can appoint 20 percent of the board members of two holding companies—several levels of intermediate ownership removed from FEMSA—that, in turn, own three foreign Heineken breweries. TABC claimed that granting Cadena's application would violate section 102.07(a)(1) because FEMSA would have an interest in both the business of a retailer (Cadena) and the business of a brewer (Heineken).

The court of appeals sided with TABC, holding that "interest" as used in section 102.07(a)(1) "broadly encompasses any commercial or economic interest that provides a stake in the financial performance of an entity engaged in the manufacture, distribution, or sale of alcoholic beverages."[7] Applying this expansive, zero-tolerance standard, the court of appeals held the Code is violated *any* time *any* person owns *any* interest—even one share of stock, apparently—in two companies engaged in different tiers of the industry. Cross-ownership of "any financial interest"

---

[6] TEX. ALCO. BEV. CODE § 102.07(a)(1).

[7] *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Com'n*, 449 S.W.3d 154, 166 (Tex. App.—Austin 2014).

and any "potential for influence" violates section 102.07(a)(1), said the court of appeals,[8] concluding that FEMSA has a forbidden interest overlapping the retailer (Cadena) and brewer (Heineken) tiers.

Distilled down, the issue is simply stated: What is a prohibited "interest" under section 102.07(a)(1)? Does Texas law forbid *any* degree of commercial connectedness, however trifling and attenuated, or are only certain cross-tier relationships prohibited, namely those that raise the specter of marketplace influence or coercion?

I would reverse and hold that FEMSA, Cadena's far-removed parent, does not have an "interest" in the business of a brewer within the meaning of section 102.07(a)(1). Reading the statute neither nonliterally nor hyperliterally, but contextually, as we must, it is apparent that "an interest" cannot mean "any interest" or "an interest of any kind"—two all-encompassing formulations used elsewhere in the Code. Texas tied-house law expressly proclaims the overriding objective of the three-tier system: "to assure the independence of members of the three-tier system."[9] This is the textually manifest "public policy," enshrined into the Code itself. The Legislature used a specific term with a specific meaning: "independence," defined by *Black's Law Dictionary* as "[t]he state or condition of being free from dependence, subjection, or control."[10] We need not deduce when we can derive. The most textually plausible interpretation is that "interest" connotes the ability to control, coerce, or influence business operations in another tier.

---

[8] *Id.*

[9] TEX. ALCO. BEV. CODE § 102.75(c).

[10] *Independence*, BLACK'S LAW DICTIONARY (http://thelawdictionary.org/independence/).

This record is devoid of any such cross-tier subjection. The corporate actors here remain independent, incapable of flexing monopolistic tendencies. The Corporate Governance Agreement expressly denies FEMSA "any right or control or influence or consultation right or other form of cooperation" relating to the Heineken Holding Companies.[11] There is no verboten cross-tier coercion, or otherwise-illicit retailer-manufacturer overlap that amounts to a tied-house violation—not unless corporate structures are discounted, company agreements are disbelieved, and contextual statutes are disregarded.

Because the Court holds otherwise, I respectfully dissent.

## I. THE HISTORY OF LIQUOR REGULATIONS LEADING TO TIED-HOUSE STATUTES

### A. England's Licensing Scheme and the American Pre-Prohibition Era

Tricking, treating, and prostitution.[12] History has regarded saloons and public houses with no small measure of disdain, deeming them places of ill repute where society's seediest subjects ply their trades on innocent passersby. Regardless, the industry has been around for millennia. And so, the industry has been regulated for millennia.

---

[11] Corporate Governance Agreement § 19.10(a).

[12] "Probably when we use the word 'saloon' most of the public understands it as a place where there can be unlimited excessive drinking in a place called a 'tied-house.' Unlimited excessive drinking because as a result of the high cost of his wares the saloon keeper would use every trick and device to encourage sales, such as treating, prostitution and so forth." David Fogarty, *From Saloon to Supermarket: Packaged Beer and the Reshaping of the U.S. Brewing Industry*, Vol. 12 CONTEMP. DRUG PROBS. 541, 564–65 (1985) [hereinafter Fogarty].

Some of the first recorded alcohol regulations took the form of criminal penalties for intoxication.[13] In the year 1000, governments began taxing the import of liquor.[14] But the real uniformity in regulation began in the 16th and early 17th centuries during the reigns of English monarchs Edward VI and Elizabeth I. In 1552, Edward decreed that ale makers must receive permission to sell their wares within the empire.[15] The new system was rife with corruption, however, and led to monopolies that the justices of the peace had little authority to curb.[16] In the early 1600s, Parliament, fed up with the corruption, passed laws giving the justices power to enforce the regulations. Incremental legislation eventually led to the Licensing Act of 1627, which required makers and sellers of "spirits" to obtain a bona fide license from the governing authority.[17] "An irrevocable monopoly was now being brought more and more into subservience to royal authority."[18] These licenses were typically only granted to taverns and inns and were for the sole purpose of offering refreshment to travelers.[19] Retailers were brought into the licensing scheme in

---

[13] Frederic A. Johnson and Ruth R. Kessler, *The Liquor License System—Its Origin and Constitutional Development*, 15 N.Y.U. L. Q. REV. 210, 210 (1983) [hereinafter Johnson] (citing the Decrees of Hlothhere, Eadric, and King Ine in 673, 685, 686, and 688).

[14] AGNES JANE ROBERTSON, THE LAWS OF THE KINGS OF ENGLAND § 2 (1925) (citing the 4th Series of the Laws of Aethebred).

[15] Johnson, *supra* note 13, at 214–15 (citing WILLIAM SEARLE HOLDSWORTH, HISTORY OF ENGLISH LAW (3d ed.) 222, 357–58.).

[16] *Id.*

[17] Act of 1 CHARLES I, c. 4 § 2 (1627) (formally titled "An Act for the better Suppressing of unlicensed Alehouse keepers").

[18] Johnson, *supra* note 13, at 216, n.83 (cleaned up).

[19] *Id.* at 218 ("These acts were designed to prevent the inns, ale-houses or victualling houses from fostering drunkenness and becoming centers of disorder. . . . No one might be served with intoxicants, except travellers and a limited class of persons whose business brought them to such places.").

1737.[20] Under the first tied-house-type statute, the "Gin Act of 1751," monetary penalties were assessed against distillers found to also be selling their own product.[21]

As the regulatory noose tightened on consumers and producers alike, justices of the peace began requiring proof of suitable premises before issuing licenses.[22] Eventually, this forced would-be tavern owners to seek loans to underwrite these "suitable premises"; breweries were all too eager to fill in this financial gap, buy the property, and lease it to the license applicant.[23] The price for this good deed? Not much. The lessee need only agree to sell their benefactor's products—and only those products.[24] "This was the purchase of public houses. When one big firm suddenly realized the profit that it would be possible to make by buying public houses and keeping them under managers of their own for the sale of their own beer only the others rushed in madly."[25] And "madly" well describes the speed with which privately owned public houses were transformed into tied houses. As one scholar noted in 1895, under the tied-house system, "It is safe to say that not more than twenty-five per cent of the inns and beerhouses are free from the brewers."[26] And thus

---

[20] Act of 10 GEO. II, c. 17 (1736–37).

[21] Act of 24 GEO. II, c. 40 §11 (1751).

[22] Sidney Webb and Beatrice Webb, *History of Liquor Licensing in England Principally from 1700 to 1830*, 88–89 (1903).

[23] George Ranken Askwith, *British Taverns: Their History and Laws*, 68, 72-75 (1928); D.M. Knox, *The Development of the Tied House System in London*, 10 OXFORD ECONOMIC PAPERS, NEW SERIES, no. 1, 1958, at 67 [hereinafter Knox].

[24] *See generally* Knox, *supra* note 23, at 66 (detailing the high levels of tavern ownership by English breweries).

[25] *Chancellor Won Point in War on English 'Pubs'*, THE SUN, May 30, 1915, sec. 5, at 3.

[26] Edward Porritt, *Five Centuries of Liquor Legislation in England*, 10 POLITICAL SCIENCE QUARTERLY, No. 4, at 624 (Dec. 1895).

the regulatory effort designed to dispose of monopolies in the alcohol trade led to the creation of the English tied-house system.

In America, too, the tied-house system figured prominently in the pre-Prohibition era. In the early 1900s, beer consumption reached a then-historic high of 21 gallons per capita annually.[27] More than 150,000 saloons existed in the United States to facilitate that consumption.[28] Even so, Americans exhibited an air of superiority and contempt regarding England's tied-house system. A 1905 article in the *San Francisco Call* reported on and lambasted an Englishman's "Turn[] on [the] Purity Movement He Supported to Lease Them to Brewers."[29] The man had previously worked with a movement that promoted the end of the tied-house system—in the author's words, a scheme whereby public houses "should not be owned by the large breweries, whose interests necessarily lie in selling as much beer as possible."[30] The man later replaced tenants at one of his own public houses with a brewery, effectively transforming those houses into tied houses. This, the article disdainfully noted, was "a striking example of the sacrifice of principle to profit by no means rare in the British aristocracy."[31] An article published in 1892 entitled "To Stop Beer Wars" gave one

---

[27] Fogarty, *supra* note 12, at 548. *Cf.* Roberto A. Ferdman, *Where the Biggest Beer, Wine, and Liquor Drinkers Live in the U.S.*, WASH. POST (July 29, 2014), *available at* https://www.washingtonpost.com/news/wonk/wp/2014/07/29/where-the-biggest-beer-wine-and-liquor-drinkers-live-in-the-u-s/ (explaining that many states experience alcohol consumption rates as high as 40 gallons per capita) (copy in case file).

[28] Fogarty, *supra* note 12, at 548; *see also* Ken Burns, *Prohibition*, Episode 1: A Nation of Drunkards, PBS (2011) (describing the nature of the American alcohol trade leading up to Prohibition—and stating more than 300,000 saloons and taverns dotted the country at the turn of the 20th century).

[29] *Earl Makes Big Profit from Saloons He Owns*, SAN FRANCISCO CALL, Jan. 15, 1905, at 20.

[30] *Id.*

[31] *Id.*

8

of the first glimpses into what Chicago could experience under a tied-house system.[32] The article explained that two English brewing companies had invested $6 million in new Chicago enterprises. According to a "director" (presumably a representative of one of the companies), "In England 99 per cent of the places selling Bass or Bullard's or Guinness beer are controlled by the brewer . . . and we propose to stop beer wars by owning saloons."[33] The most important part, in the director's view, was "that all the 'tied houses' we secure will be our customers for all time; [they] will be unaffected by beer wars and cannot be taken away from us by keener competition."[34]

## B. American Prohibition and Its Aftermath

Concerns grew and public sentiment eventually turned against saloon owners. The temperance movements waged a focused and organized war—and would settle for nothing less than complete abolition of liquor. One of the movement's chief tactics was to put up members of pro-temperance groups as candidates for office. This was particularly helpful on a national scale. For example, in 1913, the Congress overrode President Taft's veto of the Webb-Kenyon Act by a vote of 246 to 95.[35] The Act had prohibited the importation of alcohol into states that had already decided to prohibit alcohol within its borders. The Temperance Movement was suddenly much more than a religious movement out to save souls—it was a powerful political machine with a sudden big victory in its pocket.

---

[32] *To Stop Beer Wars*, THE ARIZONA REPUBLICAN, Sept. 14, 1892, at 1.

[33] *Id.*

[34] *Id.*

[35] Daniel Okrent, "Wayne B. Wheeler: The Man Who Turned Off the Taps," *Smithsonian Magazine* at 1–3. (May 2010) [hereinafter Okrent].

Emboldened by the movement's sudden success, Wayne Wheeler, leader of the powerful lobbyist group the Anti-Saloon League, moved to Washington for the express purpose of convincing members of Congress to enact a prohibition amendment.[36] Bankrolled by John D. Rockefeller, Jr. and other pro-temperance industrialists, the League dominated the movement in the early 1900s, achieving prohibition in 30 states by 1919. And in 1913 the League declared support for a federal constitutional prohibition. Amending the Constitution is a heavy lift, requiring a two-thirds majority vote from each house of Congress and then adoption of the amendment by 36 of the then 48 state legislatures.[37] In 1914, a resolution calling for an amendment to the Constitution passed out of the House committee and reached the floor for the first time in history.[38] Most House members voted for the amendment, but supporters failed to muster the two-thirds necessary to pass it out of the chamber.[39] The close vote, however, reinvigorated the movement and steeled its leaders' determination to win the war by electing enough members to Congress so that next time, the amendment would pass. And pass it did. In 1917, after the 1916 election swept temperance members into office across the country, Texas Senator Morris Sheppard led the newly

---

[36] *Id.* at 3 (citing the New York *Evening News* which called Wheeler "the legislative bully before whom the Senate of the United States sits up and begs").

[37] U.S. CONST. art. V. ("The Congress, whenever two thirds of both houses shall deem it necessary, shall propose amendments to this Constitution . . . which . . . shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states.").

[38] Similar bills had been introduced nearly every legislative session since 1876 but had never made it out of committee. Okrent, *supra* note 35, at 3.

[39] *See* 52 CONG. REC. 603, 616 (1914) (recording the votes on the constitutional amendment on December 22, 1914 as 197 "for" and 190 "against").

elected Congress to the overwhelming approval of the prohibition resolution that would become the Eighteenth Amendment.[40] The necessary state ratification followed in quick succession.

But the ingenuity of the American people would eventually defeat Senator Sheppard, Wheeler, the temperance movement, and the Eighteenth Amendment. Citizens resorted to any means—legal or illegal—to gain access to alcohol. The gains of the 1920s eroded as organized-crime syndicates rose in power, in part by providing illegal liquor to the masses.[41] And then came the Great Depression. By the early 1930s, the country was in disarray, and enforcement of Prohibition laws was not the foremost priority of the federal and state governments. The mass disobedience and rampant lawlessness spurred Rockefeller, a teetotaling member of the temperance movement, saying:

> In the attempt to bring about total abstinence through prohibition, an evil even greater than intemperance resulted—namely, a nation-wide disrespect for the law, with all the attendant abuses that followed in its train. That this intolerable situation should be done away with has seemed to me even more important for the moment than the promotion of temperance.[42]

---

[40] "Prohibition Wins in Senate, 47 to 8," N.Y. TIMES, Dec. 19, 1917. Interestingly, the secondary story accompanying this headline story remarked on the Texas Legislature's intention to ratify the amendment as soon as possible. "The pending amendment to th[e] Federal Constitution will be ratified by the Legislature of Texas at a special session, to be held in the early part of the coming year. Although the session will be called for other specific purposes by Governor Hobby, there is no doubt that favorable action upon the amendment will be taken." "Texas to Act at Once," N.Y. TIMES, Dec. 18, 1917.

[41] 1 *Organized Crime: Federal Law Enforcement Perspective: Hearing Before the President's Commission on Organized Crime*, State Dept. (Nov. 29, 1983) at 9–10 (statement of William French Smith, United States Attorney General) (detailing the rise of criminal elements determined to "distribute liquor throughout the country.").

[42] John D. Rockefeller, Jr., *Foreword* to RAYMOND B. FOSDICK AND ALBERT L. SCOTT, TOWARD LIQUOR CONTROL at vii–viii (1933).

President Roosevelt urged passage of the Twenty-First Amendment, promising that taxes from alcohol sales would benefit the nation.[43] The amendment sailed through both houses of Congress and was ratified by the states in a flurry reminiscent of the Amendment it repealed.

Rockefeller, while favoring repeal, believed the end of Prohibition would not be the end of America's "liquor problem,"[44] saying, "If carefully laid plans of control are not made, the old evils against which prohibition was invoked can easily return."[45] But he saw the writing on the wall regarding the Twenty-First Amendment and commissioned a report on the nation's impending liquor regulation.[46] *Toward Liquor Control*, written by scholars Raymond Fosdick and Albert Scott, attempted to be the first study to get in front of the problem of how states should grapple with Prohibition's repeal.[47] *Toward Liquor Control* was highly influential, leading to model legislation for states regarding the manufacture and sale of alcoholic beverages.[48] Fosdick and Scott suggested two post-Prohibition systems of regulation: (1) a monopoly approach (which they strongly preferred) that managed all alcohol sales through the government, or (2) licensing the alcohol industry under the auspices of a state regulatory board.[49]

---

[43] Campaign Address on Prohibition, 1 PUB. PAPERS. 690 (August 27, 1932).

[44] Harry Gene Levine, *The Alcohol Problem in America: From Temperance to Alcoholism*, 4 British J. of Addiction 79, 110 (December 1984).

[45] *Foreword*, *supra* note 42, at vii.

[46] *Id.* at xiii.

[47] RAYMOND B. FOSDICK AND ALBERT L. SCOTT, TOWARD LIQUOR CONTROL 1–3 (1933) [hereinafter FOSDICK].

[48] *Id.*

[49] *Id.* at 24–60.

As Prohibition's repeal took hold, President Roosevelt encouraged the states to enact sensible liquor legislation.[50] Most states adopted some version of state licensure, abiding *Toward Liquor Control*'s admonition to guard against tied houses by keeping the tiers of the industry separate from one another.[51] States implemented what has come to be known as the "three-tier system,"[52] licensing manufacturers, distributors, and retailers separately, and barring a firm in one tier from owning a firm in another. Businesses must operate only within their assigned tier. Today, 17 states use the monopoly-control model, while 33 states plus the District of Columbia have a licensing system.[53]

As in England, America's tied-house legislation took aim at the monopolistic tendencies of the brewer-retailer relationship. Connecticut's courts recognized the design of its tied-house laws, remarking the law codified an intention "to circumvent the concentration of tremendous power and inordinate control in the hands of wholesalers and manufacturers, who, by reason of economic superiority and the extension of generous business credit, might well be so circumstanced as to throttle the retail dealer and monopolize the retail market."[54]

The resulting tied-house legislation, however, was not solely the product of concerned legislators. To the contrary, *brewers* drafted the initial federal tied-house legislation on which

---

[50] Presidential Proclamation, Dec. 5, 1933.

[51] *See Maxwell's Pic-Pac, Inc. v. Dehner*, 739 F.3d 936, 939 (6th Cir. 2014) (noting most states chose the recommended three-tier system in regulating the alcoholic-beverage industry).

[52] *Id.*

[53] *See The Control Systems*, NAT. ALCO. BEV. CONTROL ASS'N, *available at* http://www.nabca.org /States/States.aspx (last visited Apr. 21, 2017).

[54] *Kantrowitz v. Liquor Control Comm'n*, 13 Conn. Supp. 248, 253 (Conn. C.P. 1945).

13

much of the subsequent state legislation would be based. Self-interest existed on all sides. The refrains of the temperance movement and a general desire to cure society of the evils of alcohol may have prompted the legislation. But the brewers, too, understood that strict tied-house prohibitions would reduce competition among brewers—no more would there be endless vying for new real estate and saloon acquisitions because tied-houses would be prohibited. The brewers also knew that tied-house prohibitions would allow them some degree of plausible deniability regarding the negative public perception of saloons.[55] Brewers that owned saloons in a tied-house system were, in a sense, directly connected to and responsible for any perceived drunkenness and debauchery. But under a tied-house-less system, brewers can sell their goods, while disclaiming any participation in or responsibility for the happenings in the saloons. Indeed, the U.S. Brewers Association attempted to use this precise argument regarding many brewers' lack of ownership of saloons. The Association disclaimed "a popular misconception" that brewers often owned all the rights in saloons.[56] To the contrary, said the Association, brewers typically only lend money to saloon owners or take mortgages on saloon property; they don't own the saloons themselves. Therefore, the Association concluded, brewers largely cannot be considered responsible for saloons.[57]

---

[55] And it was important for brewers to distance themselves here because saloon owners constantly battled the sensitivities of those in civilized circles that "saloon" was synonymous with "drunkenness." These feelings harkened back to the English's scorn of activities within the public houses, which one newspaper colorfully described as, "squalid English public house[s], where no customer is welcome unless he stands up and keeps drinking constantly as long as he can maintain his standing posture, where the serving of anything but intoxicating drinks is sternly discouraged, and where, in short, the British workingman is encouraged in every possible way to make himself a sot[.]" *Chancellor Won Point in War on English 'Pubs,'* THE SUN, May 30, 1915, sec. 5, at 3.

[56] Fogarty, *supra* note 12, at 550.

[57] *Id.*

## C. The Promulgation of Liquor Regulations in Texas

The temperance movement was as prevalent in Texas as it was elsewhere in the nation. Some sources place the Texas membership of groups such as the Sons of Temperance at 3,000 by the late 1840s.[58] Concerned citizens urged their representatives to pass laws providing for the regulation and elimination of intoxicating beverages. In 1854, the Legislature introduced a ballot measure that ordered the governor to hold an election in which the individual counties would vote on the prohibition of saloons or any other entity selling liquor in quantities less than a quart.[59] Though a majority of the counties voted not to issue licenses to liquor salesmen, we held the law unconstitutional, and it was never enforced.[60] Undaunted, anti-liquor groups like the United Friends of Temperance, Bands of Hope, the Women's Christian Temperance Union, and the Grange, among others, flocked to Texas and waged war on Texas saloons. Collectively, these temperance groups were called "Drys," in reference to their desire to turn the State of Texas "dry" from alcohol.[61]

Despite losing several referendum elections in which the Drys attempted to convince Texas citizens and legislators to prohibit alcohol, their numbers grew. And with each battle, the pro-Prohibition crowd drew support. Incremental changes came to the state's liquor laws. Though not

---

[58] 3 GAMMEL'S LAWS OF TEXAS 1560.

[59] JACQUES BAGUR, ANTEBELLUM JEFFERSON, TEXAS: EVERYDAY LIFE IN AN EAST TEXAS TOWN 558 (2012).

[60] *State v. Swisher*, 17 Tex. 441, 448–49 (1856).

[61] Austin K. Kerr, "Prohibition," *Handbook of Texas Online* (2010), available through the Texas State Historical Association at https://tshaonline.org/handbook/online/articles/vap01 (copy in case file).

outright bans, regulations greatly reduced the role of the saloon in Texas.[62] The new Constitution

of 1876 adopted local-option laws, where individual communities and counties could permit or

prohibit the sale of alcohol. Finally, in 1918, the Texas Legislature adopted the language of the

proposed national prohibition amendment. As across the nation, sweeping Prohibition legislation

was enacted, including the Dean Law, which banned the manufacture of any liquor for any

purpose.[63]

The year 1933 brought the end of Prohibition across the nation. In response to the repeal

of the Eighteenth Amendment, the Texas Legislature passed the Texas Liquor Control Act and

Texas voters adopted an amendment to the Texas Constitution legalizing the sale of beer.

Nevertheless, 199 of the state's 254 counties chose to utilize the local-control option and

maintained a complete prohibition of the sale of alcohol; only 10 counties were free from any form

of regulation. After the Twenty-First Amendment repealing Prohibition took effect in December

1933, the Texas Legislature submitted another amendment to the Texas Constitution that would

completely repeal the vestiges of statewide prohibition. Texas voters approved the amendment in

1935,[64] restoring the right of individual communities and counties to decide whether alcohol could

be sold within their respective borders. Also in 1935, the Legislature created the Texas Liquor

Control Board (renamed the Texas Alcoholic Beverage Commission in 1970) to administer and

---

[62] *See, e.g.*, *Ex Parte Bell*, 6 S.W. 197, 198 (Tex. App. 1887) (holding that a saloon's owner could be denied a liquor license when he did not provide the appropriate bond because the Legislature possessed absolute authority to regulate saloons).

[63] TEX. ALCOHOLIC BEVERAGE COMM'N, THE HISTORY OF THE TEXAS ALCOHOLIC BEVERAGE COMMISSION 1 (2005), available at https://www.tabc.state.tx.us/about_us/history/70HistoryBook.pdf (copy in case file).

[64] TEX. CONST. art. XVI, § 20.

enforce the Liquor Control Act.[65] The Act governed all alcohol-related transactions from its inception in 1933 until 1977, when it was superseded by the Texas Alcoholic Beverage Code.[66]

The State adopted the three-tier system to ensure the independence of retailers, manufacturers, and distributors and to prevent the re-creation of tied-houses that Prohibition had largely eliminated. The Liquor Control Board was tasked with supervising and regulating every phase of the state's alcoholic-beverage industry. As one court put it shortly after the Board's creation, the Legislature delegated to the Board "certain functions, among which are determining in the first place to whom and when shall certain privileges be extended to persons to sell liquors, and second, whether or not such persons so favored have breached the conditions under which the privilege has been granted."[67] The Board's overall mission and purpose mirrored the stated purpose of the Liquor Control Act, which preceded our current Alcoholic Beverage Code.[68] Currently, TABC's mission includes a charge to "ensure fair competition within the alcoholic beverage industry [and] ensure consistent, predictable, and timely enforcement of [the Code]."[69]

## II. FACTUAL OVERVIEW

Petitioner Cadena Comercial USA Corp. ("Cadena"), a Texas corporation, organized to own and operate convenience stores in the state under the Mexican brand "OXXO," wants to sell beer and wine. Cadena is a wholly owned subsidiary of Fomento Económico Mexicano, S.A.B. de

---

[65] THE HISTORY OF THE TEXAS ALCOHOLIC BEVERAGE COMMISSION at 1–2.

[66] *Id.* at 1.

[67] *Tex. Liquor Control Bd. v. Floyd*, 117 S.W.2d 530, 534 (Tex. Civ. App.—Fort Worth 1938, no writ).

[68] *See Flowers v. Shearer*, 107 S.W.2d 1049, 1054 (Tex. Civ. App.—Amarillo 1937, writ dism'd) (stating the intent of the Act was to ensure effective laws and regulations in the traffic of liquor).

[69] TEX. ALCO. BEV. CODE § 5.31(b)(3)–(4).

C.V. ("FEMSA"), a publicly traded company that owns Cadena through several intermediary Mexican holding companies. FEMSA also, via various intermediary holding companies in the United Kingdom, holds a combined twenty-percent stock interest in Heineken NV and Heineken Holding NV ("Heineken Holding Companies"). The two publicly traded Heineken Holding Companies, through its own series of intermediary companies, own three foreign Heineken brewers ("Heineken Brewers"). The TABC issued non-resident permits to each of the Heineken Brewers, allowing them to manufacture beer at foreign breweries, but none of the Heineken Brewers has a brewery in Texas. The business structures are complicated, to put it mildly, as the detailed chart attached to this opinion illustrates.

It is undisputed that Cadena has no direct interest in the Heineken Brewers (or in any other entity involved in the alcoholic beverage industry). Similarly, the Heineken Brewers have no interest in Cadena (or in any other entity within the FEMSA corporate family). When FEMSA obtained its twenty-percent stock interest in the two Heineken Holding Companies, it entered into a Corporate Governance Agreement that, among other things, entitles FEMSA to appoint one of Heineken Holding, N.V.'s five directors and two of ten members of the Supervisory Board of Heineken N.V.[70] L'Arche Green, the controlling-interest holder of the Heineken Holding Companies, was obligated to sponsor FEMSA's choice for board members, but the Corporate

---

[70] According to Heineken's records, Heineken Holding, N.V. is managed by a six-member board of directors—FEMSA's chairman holds a non-executive position on this board. Heineken N.V. is managed by a two-member Executive Board (the current members of this board are Heineken's CEO and CFO). The Executive Board is the "primary decision-making body within Heineken" and is supervised by the eleven-member "Supervisory Board." The Supervisory Board advises the Executive Board "on an on-going basis," but the Executive Board makes a majority of the decisions for the company. FEMSA holds two seats on this board—its chairman (who also sits on the Heineken Holding, N.V. board of directors) is Vice-Chairman of the Supervisory Board, and another FEMSA executive holds the second seat.

Governance Agreement specifies that FEMSA is not given "any right or control or influence or consultation right or other form of cooperation" relating to the Heineken Holding Companies.[71] Similarly, L'Arche Green and Heineken Holding reserved all rights to make decisions in its management of the Heineken Holding Companies, "independently and at their sole discretion and without any requirement to consult or cooperate with . . . FEMSA."[72] The Agreement also bars Heineken from acquiring any stock in FEMSA.

FEMSA's stores under the OXXO brand must be authorized to sell beer and wine in order to thrive in the convenience-store market. Consequently, Cadena applied for a wine and beer retailer's off-premises permit from TABC. In applying the tied-house provisions, TABC disregarded the legal separateness among the various entities in both the FEMSA and Heineken corporate families. For example, TABC collapsed the elaborate corporate structure separating Cadena from its parent, FEMSA, and considered them a single business enterprise. TABC then collapsed the corporate structure separating the Heineken Brewers from their parent holding companies, and considered them a single enterprise, also. TABC's expert testified that corporate separateness can be disregarded in the regulatory area, arguing "the layers of entities here ought to be disregarded for regulatory purposes." According to TABC, any FEMSA shareholder would have an interest in a Heineken brewer. TABC's licensing director testified that a tied-house violation would exist if someone owned FEMSA stock and also stock in a TABC-permitted retailer. Indeed, TABC interprets the Code to bar overlapping ownership of even one share of permittees at different tiers, notwithstanding multiple layers of intervening ownership. TABC then

---

[71] Corporate Governance Agreement § 19.10(a).

[72] *Id.* at § 19.10(b).

reviewed the relationship between FEMSA and the Heineken Holding Companies and determined there was a forbidden retailer-brewer overlap that violated five different tied-house statutes.

FEMSA refused to divest itself of its indirect shareholder's interest in the Heineken Brewers, and TABC's denial proceeded to an administrative hearing. At the hearing, the parties stipulated to the corporate relationships between Cadena, FEMSA, and the Heineken companies.[73] During the hearing, a witness—TABC's licensing director and an expert in alcoholic-beverage industry laws—testified that even one overlapping share of stock ownership would violate the statutory tied-house prohibitions. TABC argued that FEMSA's overlapping interest in Cadena and the Heineken Brewers was sufficient to be considered a prohibited "interest" under the Texas Alcoholic Beverage Code under any interpretation. TABC disputed that actual control is required to implicate the pertinent tied-house restrictions, but asserted FEMSA *could* control the Heineken Brewers because of its ability to appoint directors to the Heineken Companies' boards. It also argued the court should impute this connection to Cadena for purposes of regulation.

Conversely, Cadena argued that the only "interest" sufficient to violate tied-house prohibitions is one that would allow actual financial or administrative control among at least two of the three tiers. Under Cadena's interpretation, its permit application should have been granted as a matter of law because FEMSA has no ability to manage or control either the Heineken Holding Companies or the Heineken Brewers. As a result, Cadena argued, granting its application would not violate the purpose of the tied-house statute because no company within the business

---

[73] *Cadena*, 449 S.W.3d at 161.

structure would have managing control over more than one tier. Cadena further argued that FEMSA's connection with the Heineken Brewers was remote and far too attenuated to implicate historical tied-house concerns and that this interest could not be imputed to Cadena without piercing the corporate veils of all the entities involved.

At the administrative hearing, the judge denied Cadena's application based on the statutory grounds cited by TABC, finding: (1) Cadena "has a real interest in the business or premises of the holder of a manufacturer's or distributor's license"; (2) "[f]or licensing purposes, as a subsidiary of FEMSA, [Cadena] is a manufacturer"; (3) "for licensing purposes, as a subsidiary of FEMSA, [Cadena] has an interest in the business of a brewer"; and (4) issuing "the requested permit would violate Sections 102.01(c), (h), 102.07(a)(1), and 102.11(1) of the Code."[74] Cadena appealed to the trial court, which affirmed the administrative order denying Cadena's permit.[75]

The court of appeals noted it could affirm on any of the grounds cited in the administrative order, but focused specifically on section 102.07(a)(1), which provides that "no person who owns or has an interest in the business of a . . . brewer . . . may . . . own or have a direct or indirect interest in the business . . . of a retailer."[76] In analyzing this section of the Code, the court defined several terms and phrases within the statute, including, "person," "brewer," "retailer," "owns or has an interest in the business," and "own or have a direct or indirect interest in the business."[77] The Code provides a definition for "person," so the court then held that all parties—FEMSA,

---

[74] Order Den. Orig. App. for Permit, Nov. 1, 2012.

[75] Pursuant to TEX. GOV'T CODE § 2001.174 (Texas Administrative Procedure Act) and TEX. ALCO. BEV. CODE §§ 61.31 and 11.67.

[76] TEX. ALCO. BEV. CODE § 102.07(a)(1).

[77] *Cadena*, 449 S.W.3d at 163.

21

Cadena, and the Heineken Brewers—were "persons" under the statute.[78] The court also held the

Heineken Brewers fell into the category of "brewer," just as Cadena would qualify as a "retailer"

if its permit were granted.[79] Thus, the court's main point of analysis became, "whether FEMSA

owns or has an interest in the business of the Heineken Brewers and also owns or has a direct or

indirect interest in the business of Cadena."[80]

According to the court of appeals, the issue was "the extent to which section 102.07(a)(1)

implies a requirement that a disqualifying 'interest' carry with it some degree of cross-tier control

and whether implying such a requirement is essential to avoid rendering the statute

unconstitutionally vague."[81] Observing the Code failed to define the terms "own," "interest,"

and "business," the court of appeals attempted to "apply [the terms'] common meaning to the

extent consistent with the context in which they are used and the statute's objective."[82]

The court of appeals, like TABC, *contracted* the entities' corporate separateness, then

*expanded* the definition of "interest," concluding it "broadly encompasses any commercial or

economic interest that provides a stake in the financial performance of an entity engaged in

the manufacture, distribution, or sale of alcoholic beverages."[83] The court rejected Cadena's

argument for a control-focused test, stating it lacked a "foundation in the statutory text" and held

---

[78] *Id.*; *see also* TEX. ALCO. BEV. CODE § 104.01(6).

[79] *Cadena*, 449 S.W.3d at 163–64.

[80] *Id.* at 164 (cleaned up).

[81] *Id.*

[82] *Id.*

[83] *Id.* at 166.

FEMSA's financial and economic interests in both the Heineken Brewers and Cadena qualified as "interests" for the purposes of section 102.07(a)(1).[84]

The court then turned to the term "business," deciding its use in section 102.07(a)(1) was intended to be broad and include any "commercial enterprise carried on for profit."[85] Under these sweeping definitions of "interest" and "business," the court held that section 102.07(a)(1)'s "plain language applie[d] to FEMSA's own relationships, not relationships . . . imputed to FEMSA."[86] The court then addressed Cadena's veil-piercing arguments, but held even if the principles of corporate law applied "in some regulatory contexts . . . those principles are not implicated by the broad language the legislature employed in section 102.07(a)(1)."[87] Because it determined TABC granting Cadena's permit would result in FEMSA having an interest in the business of a brewer and a direct or indirect interest in the business of a retailer, the court affirmed the order denying Cadena's permit.[88]

### III. ANALYSIS

*no person who owns or has an interest in the business of a . . . brewer . . . may . . .*
*own or have a direct or indirect interest in the business . . . of a retailer*[89]

The parties agree that the Heineken Brewers are "brewer[s]," and that Cadena would be a "retailer" if granted a permit. They disagree, however, over (1) whether FEMSA is a "person," and

---

[84] *Id.* at 167–69.

[85] *Id.* at 169.

[86] *Id.* at 169–70.

[87] *Id.* at 169.

[88] *Id.* at 172.

[89] TEX. ALCO. BEV. CODE § 102.07(a)(1).

even if so, (2) what "the business of a . . . brewer" encompasses, and (3) whether FEMSA has an "interest" in the business of a brewer. For purposes of this dispute, I assume without deciding that FEMSA is a "person" and that "brewer" covers the Heineken Holding Companies that own the Heineken Brewers. The interpretive focus is thus narrow: What is a prohibited "interest" under section 102.07(a), and does FEMSA have such an "interest" in the Heineken Brewers' business?

The parties' arguments are straightforward. Cadena insists the word "interest" connotes a sense of control—*i.e.*, FEMSA must exert control over the Brewers' business. TABC rejects a control-based test and endorses the court of appeals' view that "interest" in section 102.07(a) "broadly encompasses any commercial or economic interest that provides a stake in the financial performance of an entity engaged in the manufacture, distribution, or sale of alcoholic beverages."[90]

Two significant points merit mention at the outset. First, TABC reaffirmed both at oral argument and in a post-argument letter to the Court that the Code recognizes "no *de minimis* exception," a Latinized locution of the single-share theory—that even one overlapping share of stock constitutes a tied-house violation. There is no practical difference between "no *de minimis* exception" and the "single-share theory." The terms are functionally indistinguishable. Second, the Corporate Governance Agreement makes clear that FEMSA lacks the ability to control or manage, either directly or indirectly, any aspect of any Heineken entity.

As explained below, a contextual reading of section 102.07(a)(1) forecloses TABC's crabbed "one share" interpretation, which by including all excludes all. This hyperliteral

---

[90] *Cadena*, 449 S.W.3d at 166.

construction is not fair-reading textualism, which is not allergic to interpretive aids like context. In short, the court of appeals rejected a test it says lacks a textual basis in favor of one lacking a contextual basis, a zero-tolerance test divorced from the reality of existing permittees who, as TABC concedes, hold billions of dollars in cross-tier holdings. The State of Texas, for example, through its public universities, is a retail permittee that sells alcohol at certain sporting events and mixed beverages at other university events. It also owns billions of dollars in cross-tier investments. Had TABC treated the State's application as it treated Cadena's, it would have rejected it. In other words, the State of Texas (as regulator) says the State of Texas (as regulated), is operating illegally and thus at risk of forfeiting its permit.[91]

A rational, fair-reading test cannot arbitrarily depend on who is being tested—strict for some, loose for others. Laws must be applied consistently, giving fair notice to what conduct is prescribed and proscribed. The Court's interpretation vests TABC with enormous power— rewriting statutes, collapsing separate corporate entities without an evidence-based veil-piercing inquiry, selectively applying standardless criteria in a manner that treats similarly situated applicants dissimilarly, thus picking winners and losers in the marketplace. Virtually all applicants are implicated by such a sweeping reading of "interest," a reading that bans any indirect interest of any degree—except when it doesn't. Such an arbitrary and selective permitting regime cannot be squared with Texas law, particularly the Legislature's explicitly stated public purpose of ensuring "independence," *i.e.*, the absence of outsized cross-tier influence or coercion.[92]

---

[91] *See, e.g.*, TEX. ALCO. BEV. CODE § 102.01(j) (setting the penalty for a tied-house violation at suspension or cancellation of a permit and ineligibility to reapply for one year).

[92] *Id.* § 102.75(c).

The most reasonable interpretation is this: A forbidden "interest" under section 102.07(a) connotes control, coercion, or influence over business activities in another tier, participation that imperils the Legislature's codified objective of no vertical strong-arming. No such interest is present here.

## A. Judges Must Read Statutes Neither Literally Nor Liberally, But Commonsensibly, Discerning Words' Accepted Contextual Meaning

First things first. In statutory-interpretation cases, we are to begin (and almost always end) with the Legislature's chosen text, the surest index of lawmakers' collective will.[93] Interpreting statutes is the bread and butter of modern appellate judging, and this Court has stated its view simply: The truest manifestation of what lawmakers intended is what they enacted.[94] As an interpretive method, textualism has a singular objective: ascertaining words' accepted contextual meaning when they were enacted. No concern with abstract (and thus manipulable) purposes. No concern with wished-for (and thus preference-imposing) consequences. Just an unremitting focus on giving words their contextual meaning—not literal and not liberal, but commonsensible.

And by *commonsensible*, I mean *communal*, what the enacting *community* understood their words to mean. This is the second point: "Words must be given the meaning they had when the text was adopted."[95] On this important principle, we recently quoted Justice Frankfurter: "Words

---

[93] *See Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999) ("[I]t is a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent.").

[94] *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 454 (Tex. 2012) (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006)).

[95] Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 78 (2012) [hereinafter Reading Law].

must be read with the gloss of the experience of those who framed them."[96] Our cases agree. When interpreting language, both statutory and constitutional, we aim to determine original public meaning, what the words meant to those who wrote and ratified them.[97]

Third, text cannot be divorced from context. It is said that text without context is pretext. This is a straightforward, well-defined interpretive principle, one we have asserted frequently and applied assiduously. The law, after all, begins with language, and one cardinal rule of language—not just *legal* language but *all* language—is this: "Language cannot be interpreted apart from context."[98] For judges to play their lexicographic role in the legislative project, we must be attentive not just to words standing alone, but to structure and historical architecture. On this fateful point, our precedent is clear: A judge scrupulously concerned with giving legal texts their honest meaning must always consider "the surrounding statutory landscape" and welcome, not resist, interpretive context like linguistic usages and sound interpretive conventions that help illuminate meaning.[99] Yes, this case is about the legal interpretation of one word, "interest," but that task requires us to understand the meaning of surrounding words and how they are put together.

The interpretive process recognizes that lawmaker-drafters, not judge-interpreters, enact language. Judges' interpretive role is to discern, not dictate, how the Legislature uses language.

---

[96] *Union Pac. R.R. Co. v. Nami*, 498 S.W.3d 890, 904 (Tex. 2016) (quoting *United States v. Rabinowitz*, 339 U.S. 56, 70 (1950) (Frankfurter, J., dissenting)).

[97] *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981) (citing *Manry v. Robison*, 56 S.W.2d 438, 447 (Tex. 1932)).

[98] *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011).

[99] *Presidio Ind. Sch. Dist. v. Scott*, 309 S.W.3d 927, 929–30 (Tex. 2010) ("Before parsing the language of § 21.307(a), a brief survey of the surrounding statutory landscape provides a helpful context for that section's use of the term 'party' . . . .").

The Legislature authors policy and its baked-in political bargains, and the judiciary, to avoid aggrandizing its confined-but-consequential role, must examine *all* the enacted text, not mere snippets. Yes, a statute's words reign supreme, but when seeking statutory meaning, ascetic literal parsing can sometimes cloak rather than clarify. Even when construing an ostensibly clear statute that seems intuitively obvious, we may consider related legislation plus other contextual cues to glean the text's semantic import—not *extra*-statutory materials like legislative history, but the full range of *intra*-statutory aids: grammatical conventions, dictionaries, specialized legal or technical usage, colloquial nuances, and so forth.[100] Textualism is not literalism, and courts ought not adopt wooden constructions foreclosed by statutory context, as the Court has done here.[101] The import of language, plain or not, must be drawn from its linguistic context, a self-evident rule rooted in common sense,[102] Texas statutory law,[103] and caselaw from both this Court[104] and the United States Supreme Court.[105]

---

[100] *See, e.g.*, *Molinet v. Kimbrell*, 356 S.W.3d 407, 414–15 (Tex. 2011) (rejecting often-unreliable extrinsic aids like legislative history when divining statutory context); *Tex. Lottery Com'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635–37 (Tex. 2010) (same); *Taylor*, 616 S.W.2d at 189–90 (looking to text-based semantic cues but not external aides).

[101] *See Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 451 (Tex. 2011) (Willett, J., concurring) ("Modern textualism is not allergic to context.").

[102] Some words are auto-antonyms that can mean diametrically opposite things depending on the context. For example, the word "cleave" can mean "to adhere" or "to divide." *Cleave*, WEBSTER'S THIRD NEW INT'L DICTIONARY 421 (2002). In my view, the Court's decision today "cleaves" to a myopic approach that "cleaves" literal meaning from plain meaning.

[103] TEX. GOV'T CODE § 311.011(a).

[104] *See, e.g.*, *Tooke v. City of Mexia*, 197 S.W.3d 325, 329 (Tex. 2006) (recognizing that the meaning of words "cannot be ascertained apart from the context in which they occur").

[105] *See Deal v. United States*, 508 U.S. 129, 131–132 (1993).

**B. "One Share" Is One Dimensional—"An Interest" Should Not Mean *Any* Interest, However Attenuated, But Only an Interest That Threatens Cross-Tier Control or Influence**

*"Literalness may strangle meaning."*[106]

When divining what enacted law means, the judge-interpreter's aim is not a myopic reading, but a sound one. Reading clinically does not mean reading under a microscope. Today's case concerns "interest," but that term (and its meaning) is found within a larger enactment. Accordingly, we must resist hyperliteralism—"a sterile literalism which loses sight of the forest for the trees"[107]—in favor of "literal meaning in context."[108]

Sometimes the Legislature helpfully defines the terms it uses,[109] imbuing even ordinary words with technical (and usually conclusive) meaning.[110] The Alcoholic Beverage Code, for example, has a general definitional provision, defining 28 terms, everything from "minibar" to "wine cooler."[111]

---

[106] *Utah Junk Co. v. Porter*, 328 U.S. 39, 44 (1946).

[107] *New York Trust Co. v. Commissioner*, 68 F.2d 19, 20 (2d Cir. 1933) (Judge Learned Hand writing for the court).

[108] READING LAW, *supra* note 95 at 40.

[109] *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014).

[110] *See Hernandez v. Ebrom*, 289 S.W.3d 316, 318 (Tex. 2009) ("If the Legislature provides definitions for words it uses in statutes, then we use those definitions in our task."); *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008) ("We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired.").

[111] TEX. ALCO. BEV. CODE § 1.04 (21), (24).

**1. The Legislature's Codified Purpose (to Ensure "Independence") and TABC's Own Internal Guidance Buttress the Determination That "An Interest" Connotes Something More Than *De Minimis***

Unfortunately, the Code nowhere defines "interest." When a statute is silent, judges often seek guidance in reputable dictionary definitions, particularly legal dictionaries from the enacting era, since semantic usage and nuances can shift over time. Not all dictionaries are created equal, however; some are richer and more explanatory. Unfortunately, the definition of "interest" in the 1910 edition of *Black's Law Dictionary*, available at the time Texas originally adopted its tied-house laws, isn't helpful in divining the common, preferred usage.[112] Neither are the early-1900s definitions of "interest" in the *Chambers* and *Oxford* dictionaries, which provide little aid in narrowing the possible definitions relevant here.[113] Unsurprisingly, the word "interest" can mean various things, depending on context. Using a more modern dictionary, "interest" is defined as "the power of influencing," or "persons effectively controlling an enterprise or dominating a field of activity," or "the dominating group of owners in a field of business, industry, or finance."[114]

---

[112] As to property interests, *Black's* defined "interest" as "[t]he most general term that can be employed to denote a property in lands or chattels." *Interest*, BLACK'S LAW DICTIONARY 647 (2d ed. 1910). It acknowledged that "interest" was "frequently used in connection with the terms 'estate,' 'right,' and 'title,'" but it cautioned that "[t]he terms 'interest' and 'title' are not synonymous." *Id. Black's* also defined "interest" in the context of the law of evidence. Regarding "a statute that no witness shall be excluded by interest in the event of the suit," *Black's* defined "interest" to mean "concern, advantage, good, share, portion, part, or participation." *Id.* (cleaned up). Thus, "interest" under those definitions could mean anything from a mere concern or advantage to participation, a right, a share, or title.

[113] *Interest*, CHAMBERS'S TWENTIETH CENTURY DICTIONARY 477 (1903) (including only compound interest and vested interests in land as definitions for the term); *Interest*, THE CONCISE OXFORD DICTIONARY 427 (7th ed. 1919) (limiting its definitions to interests in property or land, compound interest, a pecuniary stake, and "the pursuit of one's welfare").

[114] *Interest*, WEBSTER'S THIRD NEW INT'L DICTIONARY 1178 (2002).

In 2013, the Legislature expressly—and helpfully—declared the public policy aim of the three-tier system.[115] When legislators articulate an explicit purpose in the very words of the statute, the Court need not—and should not—speculate.[116] As two eminent legal lexicographers put it, "words are given meaning by their context, and context includes the purpose of the text."[117] Here, the Legislature codified its objective rather plainly: "It is the public policy and in the interest of this state to assure the independence of members of the three-tier system."[118] Maintaining cross-tier independence, then, is the manifest object of Texas tied-house laws. Lawmakers defined their purpose precisely, concretely, and succinctly—not to supplant text, but to give it meaning.

By contrast, it makes no interpretive difference that the Code provides, as statutes commonly do, that it should be "liberally construed," here to protect "the welfare, health, peace, temperance, and safety of the people of the state."[119] On this point—whether the legislative branch can command the judicial branch to put a liberal (or nonliberal) gloss on language—I answer no.[120] Yes, the Code's overall aim is legislatively (if nebulously) prescribed: to promote "welfare, health, peace, temperance, and safety,"[121] akin to the Constitution's goal "to form a more perfect Union,

---

[115] *See* TEX. ALCO. BEV. CODE § 102.75(c).

[116] *See, e.g.*, *Hebner v. Reddy*, 498 S.W.3d 37, 40 (Tex. 2016) ("The Texas Medical Liability Act aims to 'identify and eliminate frivolous healthcare liability claims expeditiously, while preserving those of potential merit.'") (quoting *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011)).

[117] READING LAW, *supra* note 95, at 56.

[118] TEX. ALCO. BEV. CODE § 102.75(c).

[119] *Id.* § 1.03.

[120] READING LAW, *supra* note 95, at 233 ("We think not.").

[121] TEX. ALCO. BEV. CODE § 1.03.

establish Justice, insure domestic Tranquility . . . ."[122] But diaphanous, good-government precatory provisions ought not expand text beyond its contextual meaning, lest all gauzy phrases become judicial license to impose wished-for outcomes. The judicial goal must remain fixed—ascertaining fair meaning—"the meaning that causes it to make sense."[123] Legislators can certainly supply text-specific definitions, and a purpose or preamble provision can clarify textual ambiguity, as section 102.75(c) does here, proclaiming cross-tier "independence" (read: no undue control/coercion/influence) as the goal of the three-tier system.[124] But lawmakers, by commanding "liberal construction," cannot "instruct judges to put a thumb on the scale in this fashion."[125] In our system of separated powers, interpreting laws is a quintessential judicial function.

What, then, did legislators mean by "independence"? As with "interest," the Code itself is silent. But the contemporaneous edition of *Black's Law Dictionary* offers on-point guidance, defining "independence" as "[t]he state or condition of being free from dependence, subjection, or control."[126] Similarly, "independent" is described as "not subject to the control or influence of another."[127] The Court contends independence can only be achieved by strict and total separation, but the Code says no such thing, and the Texas alcoholic-trade landscape, replete with TABC-permitted cross-tier investments, punctuates the point. Rather, as the definitions of "interest" and

---

[122] U.S. CONST. pmbl.

[123] READING LAW, *supra* note 95, at 236.

[124] TEX. ALCO. BEV. CODE § 102.75(c).

[125] READING LAW, *supra* note 95, at 233.

[126] *Independence*, BLACK'S LAW DICTIONARY (http://thelawdictionary.org/independence/).

[127] *Independent*, BLACK'S LAW DICTIONARY (http://thelawdictionary.org/independent/).

"independence" underscore, the Code's tied-house restrictions aim to rein in cross-tier coercion and subjection.

TABC's own regulations actually make this point, stating that under section 102.07(a)(1), a "direct or indirect interest in the business of a retailer" means an interest held by the manufacturer sufficient to "place retailer independence at risk."[128] Likewise, TABC's *Application Guide for Retailers* centers on control, stating that applicants "cannot *control*, in any fashion, the interests of a licensee/permittee at a different level."[129] TABC's license application form for new businesses, when discussing the prohibition of cross-tier interests, explains that applicants "cannot *control* in any fashion the interests of a licensee/permittee at a different level."[130]

Courts have long understood the fundamental purpose of Texas tied-house laws to be prohibiting "vertical integration" in the alcohol industry, to prevent anyone from "controlling" or "dominating" business operations in multiple tiers.[131] This is not an outlier view but rather a

---

[128] 16 TEX. ADMIN. CODE § 45.110(c).

[129] Texas Alcoholic Beverage Commission, *Application Guide for Retailers* at 42, Dec. 2009 (emphasis added).

[130] Texas Alcoholic Beverage Commission, Form L-B, at 2, June 2012 (emphasis added).

[131] *See, e.g.*, *Neel v. Tex. Liquor Control Bd.*, 259 S.W.2d 312, 316–17 (Tex. Civ. App—Austin 1953, writ ref'd n.r.e.) (holding the Texas tied-house statutes were enacted in an attempt "to prevent a recurrence of the evils that were prevalent before prohibition when the large liquor interests *controlled* . . . the productive and distributive channels of the industry") (emphasis added); *S.A. Discount Liquor, Inc. v. Tex. Alcoholic Beverage Comm'n*, 709 F.2d 291, 293 (5th Cir. 1983) (explaining the purpose of the statute as "preventing companies with monopolistic tendencies from dominating all levels of the alcoholic beverage community"); *Dickerson v. Bailey*, 87 F. Supp. 2d 691, 703 (S.D. Tex. 2000) ("A 'tied house' arrangement, common during Prohibition, involved manufacturers who *controlled* the distribution and sale of their products in a vertical monopoly . . . .") (emphasis added), *aff'd*, 336 F.3d 388 (5th Cir. 2003).

familiar one shared by courts[132] and state regulators[133] throughout the nation. The term "interest" in section 102.07 must be construed in light of the legislatively declared purpose of Texas tied-house laws: "to assure the independence of members of the three-tier system."[134] And "independence" connotes the absence of control, just as "interest" connotes the presence of control—or at least influence sufficient to portend forbidden cross-tier coercion.

### 2. The Code's Varying Use of "Interest"—Sometimes Narrow, Sometimes Broad—Supports an Interpretation That, As Used Here, the Term Means a Degree of Influence That Imperils Cross-Tier Independence

Courts must analyze statutes in their entirety—not cherry-picking individual words or phrases to discern meaning. The Court adopts the court of appeals' definition of "interest" as "encompass[ing] any commercial or economic interest that provides a stake in the financial

---

[132] *See, e.g.*, *Foremost Sales Promotions, Inc. v. Director, Bureau of Alcohol, Tobacco & Firearms*, 860 F.2d 229, 237 (7th Cir. 1988) (explaining the intention of the federal tied-house provision is "to prevent supplier *control* over retail outlets"); *Nat'l Distrib. Co. v. U.S. Treasury Dep't*, 626 F.2d 997, 1008 (D.C. Cir. 1980) (same) ("the [federal] tied house provision was designed to prevent *control* by alcoholic beverage producers and wholesalers over retail outlets.") (emphasis added); *Mayhue's Super Liquor Store, Inc. v. Meiklejohn*, 426 F.2d 142, 147–48 (5th Cir. 1970) (describing Florida's "Tied House Evil Act" as being designed "to prevent monopoly or *control* by manufacturers or distributors of the retail outlets of intoxicating liquors") (emphasis added); *Ted Sharpenter, Inc. v. Ill. Liquor Control Comm'n*, 518 N.E.2d 128, 130–31 (Ill. 1987) (describing the tied house as a system that "allowed the distributor to exercise almost complete *control* over the retailers") (emphasis added); *Tom Boy, Inc. v. Quinn*, 431 S.W.2d 221, 226 (Mo. 1968) (holding the purpose of the statute is to prevent "financial *control* of the retailer by the wholesaler.") (emphasis added); *Pickerill v. Schott*, 55 So. 2d 716, 718 (Fla. 1951) (holding the purpose of Florida's "Tied House Evil Act" "was to prevent monopoly or *control* by manufacturers or distributors of the retail outlets") (emphasis added).

[133] *See, e.g.*, *In the Matter of GameWorks*, Ken. Dep't of Alcoholic Beverage Control (Sept. 24, 1999) (allowing a retailers' license to be issued to a subsidiary because its parent company, with ties to a distiller, could not *control* or influence the business dealings of the subsidiary); *Licenses—Interpretation of Term "Financial Interest" in Provision of Alcoholic Beverage Law That Prohibits Manufacturers and Wholesalers From Having Financial Interest in Retailers*, 84 Op. Md. Att'y Gen. 21, 23 (Apr. 9, 1999) (explaining the definition of a tied house is a retailer "that is *controlled* by a manufacturer, wholesaler, or other [distributor]") (emphasis added); *In the Matter of GameWorks*, Liquor Control Comm'n, MICH. DEP'T OF CONSUMER & INDUS., (Dec. 17, 1997) (concluding that MICH. COMP. LAWS § 436.31 (The Michigan Liquor Control Act) did not prohibit a subsidiary from obtaining a retailers' license because the parent company could not "attain *control*" of the subsidiary or its management board.) (emphasis added); Ark. Alcohol Beverage Control Rules and Regulations § 2.28(1) (construing ARK. CODE ANN. § 3-3-212 (The Arkansas Alcoholic Control Act) to prohibit an interest that "may tend to influence [a] licensee.").

[134] TEX. ALCO. BEV. CODE § 102.75(c).

performance of [a brewer]."[135] But this considers the provision in a vacuum rather than in context, and adopts in practice TABC's "no *de minimis* exception" standard—a standard so broad as to be no standard at all. In doing so, the Court disregards the entirety of the text, separately defining discrete words and then cobbling together those separate definitions. The provision must be defined as a contextual whole, however, not merely as a sum of its stand-alone parts.[136]

The tied-house provisions focus intently on prohibiting certain relationships (and allowing others), using the word "interest" many times,[137] and usually preceding "interest" with a modifier:

- any interest[138]
- a real interest[139]
- a financial interest[140]
- a pecuniary interest[141]
- an ownership interest[142]
- an interest of any kind[143]

Section 102.07 is structured differently. Again, here's the relevant text:

---

[135] *Ante* at ___ (citing *Cadena*, 449 S.W.3d at 166).

[136] *See In re Office of the Attorney General*, 456 S.W.3d 153, 155 (Tex. 2015); *see also* READING LAW, *supra* note 95, at 167–69.

[137] *See* TEX. ALCO. BEV. CODE §§ 5.05(b), 11.10, 11.70(a), 22.04(a), 22.04(b)(1)–(2), 22.04(c), 22.06(a), 24.05(a), 28.16(2), 32.21(2), 37.04, 37.07(1), 50.003, 51.06, 61.02(b), 61.43(a)(6), 61.45(a)(1)–(2), 61.45(b)(1)–(2), 61.71(15), 61.71(27)–(28), 61.74(a)(10), 74.01(d), 102.01(c), 102.01(j), 102.04(a), 102.04(b)(1), 102.06, 102.07(a), 102.07(c), 102.11(2), 109.59(c).

[138] *See id.* §§ 102.10(b), 102.11(1), 102.18(b).

[139] *See id.* § 61.44(b)(1).

[140] *See id.* §§ 11.47, 11.61(b)(17), 28.03(8), 54.03(5), 61.44(a), 61.71(a)(28), 102.06.

[141] *See id.* § 5.05(a)(3).

[142] *See id.* §§ 6.05, 22.16(b)(2), 102.01(c).

[143] *See id.* §§ 11.48(a)–(b), 28.03(8), 61.71(a)(21), 61.71(a)(26), 102.03(b).

(a) . . . no person who owns or has <u>an interest in the business of a . . . brewer</u> . . . may . . . (1) own or have a <u>direct or indirect interest in the business of a . . . retailer</u>.[144]

It bars a person who has "an interest" in the business of a brewer from having "a direct or indirect interest" in the business of a retailer. The latter phrase, with its "direct or indirect" modifier, indicates that "interestedness" with a retailer invites a broader examination than with a brewer. The Code bars someone with an interest in a brewer from having not merely an "interest" in a retailer but something more expansive, "a direct or indirect interest." This looser "direct or indirect" formulation casts a wider net, expanding the scope of "interest" to thwart the classic tied-house arrangement of brewers controlling retailers.

The Court goes another route, holding that "interest" standing alone and unmodified necessarily includes *every* modifier sprinkled throughout the Code and "broadly encompasses any commercial or economic interest that provides a stake in the financial performance of an entity engaged in the manufacture, distribution, or sale of alcoholic beverages."[145] *All* interests. Of *any* type. In *any* degree.

I disagree. This reading is far too broad, because "interest" here (1) is *not* modified by "direct or indirect," and (2) *is* modified by the phrase "in the business of a brewer," thus it cannot mean *any* interest of *any* kind in a brewer, but logically only a *direct* interest in a brewer's business.

Neither Cadena nor its parent FEMSA has any such prohibited interest in the Heineken Brewers. Neither has legal or equitable title to the Heineken Brewers' business or stock in the Heineken Brewers, or any other direct way to exert cross-tier influence or control. Moreover, the

---

[144] *Id.* § 102.07(a)(1) (emphases added).

[145] *Ante* at ___.

Corporate Governance Agreement makes clear that FEMSA lacks any ability to control or manage, either directly or indirectly, the business of the two Heineken Holding Companies, which in turn own the Heineken Brewers. As noted above, the Agreement states explicitly that FEMSA has no "right or control or influence or consultation right or other form of cooperation" relating to the Heineken Holding Companies.[146] Similarly, Heineken Holding reserved all rights to make decisions "independently and at their sole discretion and without any requirement to consult or cooperate with . . . FEMSA."[147] The Code's tied-house provisions aim to promote "independence,"[148] and FEMSA lacks any ability to direct Heineken Brewers.

The Legislature's overarching concern with "independence"—minimizing cross-tier control and coercion—permeates the Code, which bars relationships that exert undue influence. Section 102.07 itself contains several prohibitions to restrict how a manufacturer might strong-arm a retailer. For example, a manufacturer cannot be a retailer's guarantor, pay for a retailer's advertising, give a retailer aggressive discounts, etc.[149] Similarly, section 102.01 restricts various cross-tier incursions. For example, permittees in one tier are prohibited from serving as officers in another tier.[150] Additionally, permittees may not own fixtures or equipment, provide credit security, extend loans, agree to manage, or enter into profit-sharing arrangements with a permittee

---

[146] Corporate Governance Agreement § 19.10(a).

[147] *Id.* at § 19.10(b). Now, if this arrangement were the opposite directionally, and Heineken Holding owned FEMSA stock, or if a Heineken Holding representative served on FEMSA's board, that could be a tied-house violation under provisions that cover stockholders of permittees. TEX. ALCO. BEV. CODE § 102.03(b). But the converse, governed by section 102.07(a), is not true.

[148] TEX. ALCO. BEV. CODE § 102.75(c).

[149] *Id.* § 102.07(a).

[150] *Id.* § 102.01(d).

in another tier.[151] Such activities are forbidden because they imperil independence and induce monopolistic industry practices, and lawmakers want to blunt manufacturer control/coercion/influence/subjection over retailers. But *all* potential connections are not prohibited; there is no absolute bar on even the most picayune cross-tier affiliations.[152]

The Legislature uses the terms "any interest" and "an interest of any kind" elsewhere in the Code.[153] But not here. If "an interest" captures everything on its own, then why is the broadening "direct or indirect" needed in section 102.07(a)(1)? Why are other scope-expanding modifiers used elsewhere in the Code? The Code forbids a brewer from having a "direct or indirect interest" in a retailer, but does not forbid a retailer from having *any interest whatsoever* in a brewer. Many relationships forbidden by the Code affirmatively encompass "affiliate[s],"[154] "subsidiar[ies],"[155] and majority stockholders.[156] The Legislature included no such language in section 102.07(a)(1).

---

[151] *Id.* § 102.01(e)–(i).

[152] Another point merits mention: Section 101.01(a) defines a tied house as any overlapping ownership or other prohibited relationship "*between* those *engaged* in the alcoholic beverage industry at different levels." *Id.* § 101.01(a) (emphases added). Some of those prohibited relationships are statutorily defined, as in section 102.07(a), barring a brewer from having a direct or indirect interest in the business of a retailer. This provision, read alongside other Code provisions including section 101.01 above, speaks to the relationship *between* permittees. It makes no mention of other corporate entities, or of affiliates and stockholders, as other tied-house restrictions do. In my view, it encompasses active industry participants, not parent companies, affiliates, stockholders, holding companies, or board members. FEMSA, the nonpermitted parent company of a prospective retailer and an indirect minority stockholder with a minority board position on two nonpermitted holding companies, is not "engaged in the alcoholic beverage industry." The Heineken Brewers are manufacturers, not FEMSA and not Cadena. In other words, FEMSA is not engaged in the Heineken's Brewers' business of brewing beer. And the Heineken Brewers have zero interest, direct or indirect, in Cadena's retailer application.

[153] *See id.* § 11.48.

[154] *See id.* §§ 11.48(a)–(b), 37.07, 74.01(d), 101.41(a), 101.43(a), 102.03(b), 102.11–13, 102.14(a), 102.15(a), 102.18(a)(3), 102.22(a), 102.31(b), 108.01(a), 108.05–.06, 109.08.

[155] *See id.* §§ 11.48(a)–(b), 74.01(d), 101.41(a), 101.43(a), 102.03(b), 102.11–13, 102.14(a), 102.15(a), 102.31(b), 108.01(a), 108.05–.06.

[156] *See id.* §§ 11.13(d), 11.45–.46, 11.61(a), 22.05–.06, 61.71(c), 61.74(b).

"Interest" must, then, mean something less than *any* interest, as TABC maintains. The Court holds the definition of "tied house" in section 102.01(a) is applicable here, because the definition includes "any overlapping ownership."[157] But this reading is too broad in relation to section 102.07(a)(1) because the phrase "interest in the business of a brewer" is narrower than the breadth of the Code as a whole.[158] The independence of the three tiers was the Legislature's explicit objective, and tied houses were originally formed because of the intersection of retailers' financial pressures and brewers' corresponding financial benevolence. The prohibition of cross-tier interests, then, affects financial interests.

FEMSA's twenty-percent stock ownership in the Heineken Holding Companies does not mean it can step into the shoes of the Heineken Brewers or even flex influence to the point of affecting the Brewers' business. The publicly traded FEMSA is separated by at least three parent or holding companies from the Heineken Brewers. Two of these intermediate companies are internationally publicly traded companies. Additionally, though FEMSA's officers hold positions on the board of directors and a "supervisory board," these positions relate only to the Heineken Holding Companies, not the Heineken Brewers. Insofar as the holding companies control the actions of the Brewers, the Corporate Governance Agreement strips FEMSA of any ability to direct or control any aspect of the Brewers' dealings. FEMSA is both legally (by the Corporate Governance Agreement) and practically (by nature of its attenuation from the Brewers) barred from any attempt to act in place of or exert control over the Heineken Brewers.

---

[157] *Ante* at ___; *see also* TEX. ALCO. BEV. CODE § 102.01(a).

[158] *See* TEX. ALCO. BEV. CODE § 102.07(a)(1).

The statutory context of section 102.07 strongly indicates that an "interest" must involve more than mere stock ownership. Elsewhere in section 102, for example, the Legislature expressly—and repeatedly—refers to interests in "corporate stock":

- Section 102.01(c) discusses an "ownership interest in the business *or* corporate stocks."[159]

- Section 102.10(b) includes "any interest in the permit, *business*, assets, or *corporate stock*."[160]

- Section 102.18(b) refers to "any interest in the license, *business*, assets, or *corporate stock*."[161]

This treatment is not unique to section 102. Indeed, throughout the Alcoholic Beverage Code references to interests in corporate stock appear frequently and—at least three times—are distinguished from interests in a business:

- Section 37.04 states that "[a] person who holds a nonresident seller's permit may have an interest in the *business*, assets, *corporate stock*, or permit of a person who holds a brewer's permit."[162]

- Section 37.07 refers to "an interest in the permit, *business*, assets, or *corporate stock*."[163]

- Section 5.05 distinguishes between "hold[ing] stocks or bonds in an alcoholic beverage business" on one hand,[164] and "hav[ing] any financial connection with a person engaged in an alcoholic beverage business" and "hav[ing] a pecuniary interest in an alcoholic beverage business" on the other hand.[165]

---

[159] *Id.* § 102.01(c) (emphasis added).

[160] *Id.* § 102.10(b) (emphases added).

[161] *Id.* § 102.18(b) (emphases added).

[162] *Id.* § 37.04 (emphases added).

[163] *Id.* § 37.07 (emphases added).

[164] *Id.* § 5.05(a)(2).

[165] *Id.* § 5.05(a)(1), (3).

This distinction is also true for statutes *outside* the Alcoholic Beverage Code; in many other instances "interest" encompasses even the ownership of a small percentage of stock.[166] Nevertheless, and as articulated above, section 102.07(a) does not define interest as stock ownership and does not contemplate that even a small percentage of stock qualifies as an "interest." Texas law recognizes corporate separateness, the principle that subsidiaries have distinct legal identities from their holding or parent corporations.[167] It is a fundamental principle that different corporate entities must be treated as legally distinct, even if one is owned by another. Thus a shareholder, as an investor, has a financial interest in a company's monetary value. But the shareholder has no cognizable legal interest in the company's assets.[168]

There is not even the assertion here that the complicated FEMSA/Heineken corporate structure, specifically the intermediate entities between FEMSA and the Heineken Holding Companies, are being finagled to circumvent Texas tied-house laws.[169] Nevertheless, the Court disregards the entities' corporate separateness, collapsing all distinctions between parent

---

[166] *See* TEX. EDUC. CODE § 51.923(e) (defining "[f]or purposes of this section" the term "substantial interest in a business entity" as, among other things, owning "10 percent or more of the voting stock or shares of the business entity"); *id.* § 66.08(k) (defining "[f]or purposes of this section" the term "interest in a business entity" as, among other things, owning five percent or more of the voting stock or shares of the business entity); TEX. LOC. GOV'T CODE § 171.002(a) (defining "[f]or purposes of this chapter" the term "substantial interest in a business entity" as, among other things, owning "10 percent or more of the voting stock or shares of the business entity"); TEX. GOV'T CODE § 572.005 (defining "a substantial interest in a business entity" as, among other things, "a controlling interest in the business entity" and owning "more than 10 percent of the voting interest in the business entity").

[167] *See Gentry v. Credit Plan Corp. of Hous.*, 528 S.W.2d 571, 575 (Tex. 1975); *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 340 (Tex. 1968) (citing *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 202 (Tex. 1962)).

[168] *See, e.g.*, *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 854 (Tex. 2011) ("[S]hareholders of a corporation are not owners of corporate assets.").

[169] *See SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 450–51 (Tex. 2009); *Castleberry v. Branscum*, 721 S.W.2d 270, 271–72 (Tex. 1987) (holding corporate separateness will not be observed when the separation is used as a means to "perpetrat[e] fraud," a monopoly, or evade legal obligations).

companies, holding companies, and subsidiaries. I disagree that veil-piercing principles do not apply "in the regulatory context," absent evidence of furtiveness. Cadena and FEMSA are distinct corporate entities, separated by multiple layers of intermediate corporations. Likewise, the Heineken Holding Companies and Heineken Brewers are distinct corporate entities, separated by multiple layers of intermediate corporations. The burden should have rested on TABC to make the case for disregarding distinct corporate identities. But, despite TABC offering no evidentiary basis for ignoring corporate separateness, the Court adopts TABC's reasoning as its own.

Again, the Legislature knows well how to forbid specific relationships. If lawmakers had wished for section 102.07(a)(1) to disrespect corporate separateness, paying no mind to distinct legal identities, they could have done so, as they did in other Code provisions.[170] Chapter 102 of the Code indeed specifies certain prohibited intra-industry relationships and different degrees of acceptable inter-tier connectedness. Some sections within Chapter 102 explicitly include "affiliates" and "subsidiaries" of a permittee when listing prohibited relationships.[171] Other sections, like section 102.07(a)(1), do not.[172] Some sections within the Code broadly define prohibited relationships and forbid "an interest of any kind," including stock ownership.[173] Others, like section 102.07(a)(1), do not.[174] All to say, the Legislature is adept at prohibiting specific

---

[170] *See* TEX. ALCO. BEV. CODE. §§ 11.48(a)–(b), 37.07, 74.01(d), 101.41(a), 101.43(a), 108.01(a), 108.05–.06, 109.08.

[171] *Id.* §§ 102.03(b), 102.11–13, 102.14(a), 102.15(a), 102.18(a)(3), 102.22(a), 102.31(b).

[172] *Id.* § 102.07(a)(1).

[173] *See id.* §§ 11.48(a)–(b), 28.03(8), 61.71(a)(21), 61.71(a)(26), 102.03(b).

[174] *See id.* § 102.07(a)(1).

relationships when it wishes to, and vice versa. We should presume the Legislature included words it wanted to include and excluded words it wanted to exclude.[175]

The Court should have rejected TABC's contention that corporate separateness can be blithely disregarded in the regulatory context. Our cases are precisely the opposite, resisting regulators' attempts to treat distinct legal entities as one, unless the record shows the parent controls the internal business operations and affairs of the subsidiary.[176] In this case, TABC has never produced evidence of (or even *alleged*) "subterfuge ownership" or other abuse or circumvention that would justify veil-piercing.[177] Cadena fully disclosed the complicated FEMSA- and Heineken-related corporate relationships, complexity driven by tax and corporate laws, and TABC never alleged, much less demonstrated, that these entities were anything other than distinct legal identities. The Legislature has repeatedly drafted language to forbid specific corporate relationships involving parents, subsidiaries, affiliates, etc. It did not so do in section 102.07, presumably on purpose.

The Court's error here is two-fold: (1) it improperly ignores corporate separateness (collapsing distinct legal entities across multiple levels throughout the FEMSA and Heineken corporate families based solely on stock ownership), and then (2) interprets "interest" so open-endedly that it prohibits nonprohibited relationships. TABC erred in treating far-removed entities as one interconnected business enterprise and the Court compounds that error here. Cadena and

---

[175] *See Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 438 (Tex. 2016) (citing *Ruttiger*, 381 S.W.3d at 452).

[176] *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002) (requiring evidence of parental control to "fuse" the parent and subsidiary for jurisdictional purposes).

[177] *See* TEX. ALCO. BEV. CODE § 109.53; *see also SSP Partners*, 275 S.W.3d at 455 (holding "there must be evidence of abuse, injustice, or inequity" to disregard corporate separateness) (cleaned up).

FEMSA are not a single retailer entity, nor are the Heineken Brewers and Heineken Holding Companies a single brewer entity. The majority's free-wheeling interpretation, disregarding distinct legal identities, confers limitless power upon TABC. Unanchored in statutory text, the Court's interpretation grants TABC the authority to selectively and arbitrarily permit similar applicants dissimilarly.

### 3. TABC's Ascetic View That the Code Allows "No *De Minimis* Exception"—aka the Single-Share Theory—Invites Absurd and Arbitrary Results

The Court today adopts TABC's view that section 102.07(a)(1) covers not only every *type* of interest, but also every *quantum* of interest, however slight and trifling. The Court offers assurances that we aren't dealing with a single-share issue here, concluding we need not decide the issue.[178] But the logically inescapable extension of interpreting "interest" to mean *any* financial interest *is* the so-called single-share theory, an interpretation that would yield nonsensical results— not just odd results, but preposterous ones. A single-share interpretation, as opposed to asking whether an entity in one tier exerts control or influence over an entity in another tier, is neither rational nor practical. No reasonable person could have intended it, which is the very definition of absurdity. Indeed, changing "an interest" to "any interest"—and applying it across the board— would require the revocation of many currently issued alcohol permits (those granted to brewers

---

[178] *Ante* at ___.

44

and retailers alike).[179] The absurdity bar in this Court is a high one,[180] but the single-share theory scales it—easily.

Under the Court's hyperliteral interpretation of section 102.07(a)(1), an individual or special-interest group could easily manipulate and potentially wreak havoc on the permitting system. Everyone could be affected—from the mom-and-pop general stores that dot our rural counties to the large retail chains with locations across the state and nation. Without the ability to provide alcohol to their guests and customers, many of these establishments would be run out of business. Under the Court's restrictive view—a practical application of the single-share theory— any person can unilaterally imperil the permit of a Texas business. How? Buy a share of stock in that company. Then buy a share in another company permitted within another tier. According to the Court and TABC, both companies are now in violation of section 102.07(a)(1) and must lose their permits.[181] A disgruntled employee could potentially buy shares in a retailer and a manufacturer and ensure both will lose their permits. Motivated competitors could buy cross-shares of both up-and-coming and long-standing industry rivals and end their quests for economic success. The consequences of the Eighteenth Amendment could again be realized if modern-day teetotalers obtained interests in different tiers of the industry in order to shut down the Texas

---

[179] The Court insists we need not address the single-share theory, asserting, and eventually holding, that it need only decide whether FEMSA has a prohibited interest without deciding what "interest" really means. But litigants come to this Court seeking concrete guidance, not coy Magic 8 Ball responses like, "Ask again later" or "Better not tell you now." How can we apply a statutory term without knowing what it means? More to the point, TABC presented its single-share theory at trial in this case to explain its legal basis for denying Cadena's permit. TABC then continued to defend the single-share theory before the court of appeals. Here, TABC says application of the theory is simply not present. I disagree.

[180] *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 569 (Tex. 2014) (plurality) (holding the absurd-result bar is "high, [as] it should be.") (quoting *Combs v. Health Care Serv. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013)).

[181] *See, e.g.*, TEX. ALCO. BEV. CODE § 102.01(j) (setting the penalty for a tied-house violation at suspension or cancellation of a permit and ineligibility to reapply for one year).

alcohol trade. A lone citizen convinced of the evils of alcohol could use today's holding to ensure his neighborhood grocery store was alcohol-free. This is a ridiculous interpretation. And it not compelled by a fair, contextual reading of section 102.07(a)(1).

Even without a bad actor spurred by malicious intent, the single-share theory will still affect the management of mutual funds, insurance agreements, retirement plans, and nearly anyone with a diversified portfolio.[182] If section 102.07(a)(1) applies to *any* financial interest, then:

- Section 102.07(a)(2) prohibits a father who owns stock in a brewery from giving a Christmas present to his son who owns stock in a retailer.[183]

- A neighbor who owns stock in one tier is forbidden from housesitting for a neighbor with an interest in another tier.[184]

- A child with an investment account for college tuition can no longer receive his allowance from parents who own even a single stock in a different tier of the industry.[185]

- A bank cannot loan money to both a local brewer and a local retailer.[186]

If these situations seem impossible or far-fetched, it bears repeating: TABC insists there is "no *de minimis* exception." Their position, baked into today's holding, inevitably leads to the single-share rule, which, given the nature of modern stock ownership, mutual funds, and pension

---

[182] TABC argues mutual funds should (and would) be treated differently, much like the rules governing the recusal of judges contemplate and except most mutual funds from consideration. But as TABC is quick to point out—no exception exists in section 102.07 for *de minimis* ownership or interest. So, too, the statute does not contain an exception for participation in mutual funds. Instead it's an all-or-nothing argument. If an interest means "any interest," then, absent an explicit exception, it necessarily includes mutual funds and the like.

[183] *See* TEX. ALCO. BEV. CODE § 102.07(a)(2) (prohibiting cross-tier gifts of any "thing of value").

[184] *See id.* (prohibiting cross-tier furnishing or lending of "services").

[185] *See id.* (prohibiting cross-tier furnishing of money).

[186] *See id.*

plans, would be tantamount to *de facto* Prohibition if enforced. TABC counsel agreed that under a single-share rule, "a large number of current permit holders . . . are violating the statute." And "if the statute does impose share . . . prohibition," that would "cause[] a lot of problems and would result in a lot of cancellations and revocations." Nonetheless, the Court, while acknowledging TABC's post-argument view that there is no *de minimis* exception, adopts an expansive interpretation indistinguishable from the "one-share rule" and dictates a disquieting result: Countless current permittees, including State permittees, are operating illegally by TABC's own admission.

TABC says regardless of whether the Code prohibits *de minimis* cross-tier interests, "TABC need not enforce that prohibition against a *de minimis* interest." Today's case, though, is about selective permitting, not selective enforcement. This is a permitting case, not an enforcement case. The Legislature sets the permitting criteria, not TABC. The question is simply stated: Does Cadena meet the objective statutory criteria? Either Cadena qualifies for a retailer permit or it doesn't. And if Cadena qualifies, TABC has no discretion to deny the permit. Courts, including the U.S. Supreme Court, have repeatedly recognized that selective permitting, unlike prosecutorial discretion, is impermissible where someone is "treated differently from others similarly situated" with "no rational basis for the difference in treatment."[187]

TABC contends, "it is one thing to *interpret* a statute as being applicable to a certain factual scenario, and quite another to *enforce* it in that scenario," adding, "just because an agency interprets a statute to apply in a particular situation does not mean the agency must always enforce

---

[187] *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383, 387 (5th Cir. 2008).

it in that situation." The rules are the rules, and I am unaware of any principled basis, certainly none required by the Code, for applying them differently to different companies. Alcohol laws are complex, but the Rule of Law requires uniformity, not selective enforcement and anticompetitive favoritism benefitting preferred permittees.

Every industry actor has an "interest" in knowing what Texas law does and does not require. Every industry actor has an "interest" in TABC adopting a consistent permitting approach that applies the law uniformly to incumbents and newcomers alike. It is not enough to cast the single-share situation as a purely hypothetical scenario and insist that TABC would refrain from expending its enforcement resources in such an audacious way. In this Court, TABC was unwilling to defend the single-share theory yet also unwilling to disavow it. It dismisses the single-share standard as a fictitious stalking horse that it refuses to dismount.

At oral argument, the State reaffirmed its view that the statute contains no *de minimis* exception and that numerous current permittees are in violation of Texas tied-house laws:

> JUSTICE BROWN: But under the interpretation that the agency favors, aren't there already a large number of current permit holders who are violating the statute?
>
> ATTORNEY: There are, there are. And this gets through to the distinctions between interpretation of the statute and enforcing it.
>
> *   *   *
>
> JUSTICE BROWN: But it's the agency's position that there is not a *de minimis* exception, correct?
>
> ATTORNEY: There is no *de minimis* exception.
>
> *   *   *
>
> CHIEF JUSTICE HECHT: I take your point about the difference between enforcement and licensing. But if the statute does impose a single-share prohibition, can it practically be enforced?

ATTORNEY: Probably not or at least in the way that causes a lot of problems and would result in a lot of cancellation or revocations. But again, we don't have any evidence that that's happening.

TABC asserts it is "not trying to walk away from" the one-share rule; it will just never enforce it. Startlingly, the Court seems untroubled by TABC's insistence on an admittedly unenforceable standard that arbitrarily favors some businesses and disfavors others.

Again, every Texan possesses a legitimate "interest" in knowing what Texas law prescribes and proscribes and that those in power will enforce it evenhandedly. TABC, when pressed for a principled basis for treating similar businesses dissimilarly, responds: fear not—lack of enforcement resources will prevent uniform enforcement of its "no *de minimis* exception" position. This is distressing.

Legal rules must apply consistently to everyone, meaning TABC treatment of industry upstarts must match TABC treatment of industry heavyweights. TABC's enforcement regime today can fairly be described as passive-aggressive: passive for some, aggressive for others. "[N]o *de minimis* exception" is synonymous with "no limit to our discretion." But equal treatment under the law means precisely that, not vesting regulators with standardless power to play legal favorites.

As noted above, TABC promises to exercise prosecutorial discretion in enforcing its expansive interpretation of the statute, partially by admitting its inability to enforce uniformly a single-share rule. Indeed, TABC's denial of Cadena's application clashes with its treatment of other similarly situated permittees. The record shows billions of dollars of cross-tier ownership by permittees at the retail and brewer tiers. Cadena's application was rejected while other retail permittees simultaneously own stock in publicly traded manufacturers.

Interpreting a statute in a manner that ratifies unequal enforcement is odd. Our focus should not be on line-drawing—isolating the lowest percentage below which ownership interests must fall to satisfy section 102.07(a)(1). Instead, we should read "interest" in the context of related statutes, particularly the codified purpose of ensuring actors' "independence." This non-ascetic reading yields a more contextual and thorough understanding of "interest": a financial stake sufficient to exert cross-tier influence or coercion.

A common-sense reading of the Code is especially warranted here given the Legislature's express admonitions against "subterfuge and related practices" by industry participants.[188] When it comes to liquor regulation, the path of the law has been a rocky one. Perhaps because of the long, colorful history of liquor regulation and the difficulties governments invariably experience in attempting to regulate alcohol, the Legislature has inserted repeated statutory edicts into the Code that prohibit specific conduct as well as any "subterfuge" whereby industry participants engage in gamesmanship that technically complies with the Code but undermines its goals. In my view, prohibiting subterfuge should cut both ways, by seeing through attempts to avoid compliance but also by avoiding hyper-technical constructions that find violations defying common sense. The Legislature's unease with artifice should dissuade interpretations that invite nonsensical ripple effects that either permit proscribed conduct or proscribe permitted conduct.

---

[188] *See* TEX. ALCO. BEV. CODE § 102.07(a) (requiring certain payments by cash and further providing that "[n]o holder of either type of license may use a maneuver, device, subterfuge, or shift by which credit is accepted"); *id.* § 102.01(g) ("If a permittee secures a loan from a source outside the state, there is a presumption of a tied house relationship or subterfuge . . . ."); *id.* § 109.53 ("It is the intent of the legislature to prevent subterfuge ownership of or unlawful use of a permit or the premises covered by such permit; and all provisions of this code shall be liberally construed to carry out this intent, and it shall be the duty of the commission or the administrator to provide strict adherence to the general policy of preventing subterfuge and related practices hereinafter declared to constitute unlawful trade practices.").

## IV. CONCLUSION

During Prohibition, Americans seeking alcoholic refreshments scarpered to the black market in mass disobedience. The "noble experiment" (President Hoover's term)[189] had many ignoble consequences, however, and after the Twenty-First Amendment was ratified, states were urged to adopt protective measures to forestall pre-Prohibition licentiousness and lawlessness. President Roosevelt pleaded for temperance, condemning "the curse of excessive use of intoxicating liquors" and imploring states to regulate liquor purchases in a way that avoided the "repugnant conditions" that predated the Eighteenth Amendment: "I ask especially that no state by law or otherwise authorize the return of the saloon in its old form or in some modern guise."[190]

For 80-plus years, Texas's tied-house laws have mandated a three-tiered alcohol industry—producers, distributors, and retailers—to guard against the criminal element in alcoholic-beverage trafficking and to prevent cross-tier ownership overlaps that induce coercion, monopolies, and domination. With this in mind, in the tied-house context, "interest" should mean "control."

This Court has a well-earned reputation for textualism, an interpretive mooring that prizes clear interpretive rules, eschews legal dice-loading, and minimizes judicial lawmaking. Policy calls are for the political branches, not adventurist, reform-minded judges. Fidelity to text, by curtailing judicial discretion and prizing well-defined rules consistently applied, best secures certainty and thus the Rule of Law. Unlike other methods of interpretation, like purposivism, scrupulous textualism is politically agnostic, and proudly so—caring not whether a result scratches

---

[189] Herbert U. Feibelman, *Another Noble Experiment*, 34 COM. L. LEAGUE J. 152 (1929).

[190] Presidential Proclamation, Dec. 5, 1933; *see also* "Prohibition Repeal is Ratified," N.Y. TIMES, Dec. 5, 1933, at A1.

an ideological itch, but only whether interpretive principles are applied forthrightly to honor the political bargains of legislators, whatever color their jersey.

That said, interpretation is done by flesh-and-blood people, and as this case shows, textualism does not guarantee unanimity. Some disputes are hard, and avowed textualists will disagree. Chief Justice Marshall observed the slipperiness of words nearly two centuries ago: "Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea . . . ."[191] Words *are* slippery, and interpreting slippery words eludes robot-like precision. Textualist readers invariably read text variably. Judges seize upon different interpretive clues and balance them differently, not to reach a desired outcome but through earnest grappling. Determinations can be particularly indeterminate when excavating how an original interpretive community, perhaps generations or centuries ago, understood the language they enacted. That's why we're a nine-member Court, in hopes that collaborative (and hopefully collegial) jousting will sharpen our analysis.

The Court doubtless believes its hyperliteral interpretation—reading "*an* interest" as "*any* interest"—is more pragmatic and workable. I disagree with this consequentialist view, which, in any case, does not square with reality, given the irrationality of the single-share theory. Our commitment to judicial textualism and self-abnegation requires us to honor what has been written. Judges ought neither draft laws nor revise them under the guise of interpreting them. Rather, we should seek an *objective* basis for interpretation, namely the semantic, contextual meaning of the

---

[191] *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 414 (1819).

words themselves.[192] The term "interest" may seem all-encompassing standing alone, but as explained above, context clarifies content. Courts are tasked every day with assigning meaning to imprecise language. Isolating the exact point when an "interest" becomes unduly influential or coercive resists mathematical certainty. But it is no more blurred as when judges determine under the U.S. Constitution when a search is "unreasonable"[193] or bail "excessive"[194] or cause "probable"[195] or punishment "cruel and unusual."[196] These are vexing, fact-laden inquiries, requiring judges to be judgmental.

Unfortunately, the Court adopts a construction of "interest" so stringent as to deform fair meaning. TABC does not dispute that numerous current permittees hold billions of dollars in so-called cross-tier investments, and nothing like the evils that plagued the classic tied-house paradigm of saloons controlled by breweries has befallen Texas. It blinks reality to grumble that the State's entire regulatory scheme hangs in the balance when TABC countenances scores of overlapping interests that, under its "no *de minimis* exception" position, are illegal and ripe for revocation. If anything threatens functional derailment of the three-tier system, it is strict, no-favorites enforcement of TABC's no-exception standard.

FEMSA's equity stake in the Heineken Holding Companies does not implicate section 102.07(a)(1)'s concern with retailer-manufacturer overlap. The Court seeks to enforce "strict

---

[192] "We do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 HARV. L. REV. 417, 419 (1899).

[193] U.S CONST. amend. IV.

[194] U.S. CONST. amend. VIII.

[195] U.S. CONST. amend. IV.

[196] U.S. CONST. amend. VIII.

separation" between the three tiers, but the Legislature does not proscribe all cross-tier relationships, only specifically enumerated ones. The Code is a hodgepodge of laws enacted since Prohibition's repeal, and lawmakers over time have tweaked the Code, inviting overlap through exceptions to the three-tier system. For example, wineries can operate across all three tiers;[197] brewpubs can sell their product directly to retailers;[198] small brewers and manufacturers can distribute wholesale and sell retail;[199] package stores can also be local distributors.[200] Strict in rhetoric is sometimes lenient in reality.[201]

Nothing in section 102.07 addresses, much less forbids, an applicant's parent company from having an indirect minority stock ownership in the parent companies of non-resident brewers. The Code's overriding goal of safeguarding "independence"—the absence of control, coercion, and subjection—is not imperiled by such attenuated, far-removed connectedness that doesn't portend vertical domination, or even trace influence.

The state vested TABC with authority to regulate the alcoholic-beverage industry, and history provides a backdrop for the wisdom of tied-house statutes. But no state agency should be able to discriminate indiscriminately. TABC's "no *de minimis* exception" standard confers vast

---

[197] TEX. ALCO. BEV. CODE § 16.01.

[198] *Id.* § 74.03(a).

[199] *Id.* § 12.052.

[200] *Id.* § 22.03(a).

[201] That said, some Texas liquor restrictions are quite sacrosanct, and unique to the Lone Star State, For example, privately held companies can sell hard liquor in Texas while publicly traded companies cannot. TEX. ALCO. BEV. CODE § 22.16. Another example: the five-permit cap on liquor store ownership. *Id.* § 22.04. Under Texas law, no person can hold more than five "package store" permits, but certain people avoid the cap by consolidating permits "into a single legal entity" with their parents, siblings, and children, a maneuver that frees them to own an uncapped number of liquor stores. *Id.* § 22.05. Consanguinity matters, and so does incumbency—businesses established before May 1, 1949 are exempt from the five-permit limit. *Id.* § 22.04(c).

autonomy and conjures an erratic system of constantly moving goalposts. Government must not treat similarly situated parties dissimilarly, playing regulatory favorites by applying different standards to different companies.

Such effects were in fact predicted by the authors of *Toward Liquor Control* in 1933:

> Any licensing system tends to project the whole question into politics and to keep it there. Indeed, it compels the traffic to be in politics of self-protection. The licensing body becomes a powerful political engine. Every licensee . . . begins to marshal his own political strength to serve his own ends.[202]

Section 102.07(a)(1) prohibits one with an interest in a brewer from having a direct or indirect interest in a retailer. Neither Cadena (the applicant) nor its distant parent FEMSA influences or controls the business of the Heineken Brewers in such a way as to hazard the Brewers' "independence." It is fanciful to contend that Texas tied-house laws, explicitly aimed at preserving actors' independence, are remotely imperiled.

On this record—corporate separateness cemented by a governance agreement that denies FEMSA any form of influence that would imperil the Code's stated goal of "independence"—there is no prohibited, cross-tier "interest" under section 102.07(a)(1). Because the Court holds otherwise, I respectfully dissent.

_____

Don R. Willett
Justice

**OPINION DELIVERED:** April 28, 2017

---

[202] FOSDICK, *supra* note 47, at 59.

# HEINEKEN OWNERSHIP STRUCTURE

## FEMSA OWNERSHIP STRUCTURE

**HEINEKEN OWNERSHIP STRUCTURE**

Priority Shareholders

Heineken Family
Greenfee B.V.
88.55%
11.45%

Free Float
33.982%

Lárche Green
51.083%

Free Float

Heineken Holding NV (the Netherlands) *Shares listed in Euronext Amsterdam*
14.935%

Information based on public sources

Heineken NV (The Netherlands) *Shares listed in Euronext Amsterdam*
50.005%
37.463%
*12.532%

Information based on research and other sources that can not be verified and there may be some other intermediate companies

CCM – (Mexico)
Heineken Brouwerijen (The Netherlands)
Heineken Italia

**BREWER**

Registered Owner
(Beneficial Owner)

**FEMSA OWNERSHIP STRUCTURE**

Mexican Families and companies
Mexican Control Trust
38.69%

Free float
61.31%

Fomento Económico Mexicano, S.A.B. de C.V. (Mexican Holding) *Shares listed in Mexico and NY*

TH Beer Equity Ltd (UK)
100%
0.001%

CB Equity LLP (UK)

General Partner A
General Partner B
100%

Premium Enterprise Management B.V. (The Netherlands)

General Partner B
0.0001%
General Partner A
99.9998%

CV2 Dutch Equity Partnership Two C.V. (The Netherlands)
0.0001%
0.0001%
99.9998%
Limited Partner

CV1 Netherlands Beer Partnership One C.V (The Netherlands)
Limited Partner
0.0001%

44.999%
25%
30%

Cia Internacional de Bebidas, S.A. de C.V. (Mexican Holding )

99.999%
99.999%

Grupo Industrial Emprex, S.A. de C.V. (Mexican Holding )
0.001%
0.001%
0.001%

Emprex Servicios, S.A. de C.V. (Mexica Holding )
99.999%
99.999%

FEMSA Comercio, S.A. de C.V. (Mexican Holding )
0.001%
99.999%

0.001%
Emprex Franquicias, S.A. de C.V. (Mexican Holding)
99.999%

Perfil Corporativo, S.A. de C.V. (Mexican Holding )
0.001%

In the Mexican law there is a requirement that each company shall have at least 2 shareholders, this is the reason why there's a shareholder with 0.001% in each

Cadena Comercial USA Corp. (Texas)
100%

**RETAILER**